Here to give this Honorable Appellate Court for the 2nd Judicial District is now in session, the Honorable Robert A. McLaren, III. Please be seated.  Yes, Your Honor, the only case on the docket this morning is 2-22-0397. Vera Purcell and John Patton Purcell, plaintiff's appellants, v. Kemper Sports Management, Inc. Arguing on behalf of the appellants, Mr. Francis Patton Murphy. Arguing on behalf of the appellee, Mr. Michael Harden. Thank you. Mr. Murphy, you may proceed. Good morning, Justices. Good morning. As you know, my name is Francis Patrick Murphy, and I have the privilege of representing Vera and John Patrick Purcell before you this morning. I may keep my remarks very short, and I may speak slowly because I had a root canal yesterday, and I've been told that I garble my words. So bear with me. I believe that this appeal has merit, and you should reverse some of the judgment because there are several questions of fact in this record that the jury should decide. The trial court relied upon heavily in deciding the first question of fact, and that was the source of the water. The trial court found that Lowen v. Walgreens and Dominick's Foods was instructive. I think he said it was controlling, and in fact, it was the foundation of his opinion for summary judgment. In this clubhouse for the Deer Path Golf Club, we have a porcelain tile floor. In a dry state, porcelain tile floor is a safe floor, even with golf spikes. If it's contaminated, like with water, it becomes unreasonably dangerous. So you're saying that a different type of flooring should have been used? I do not say that. What I'm saying is it needs to be maintained in a dry fashion and that not all porcelain tile floors are dangerous per se.  The trial court found that the water that caused Vera Purcell to fall on September 27, 2018, was tracked in water, came from natural accumulation. If we look at that case and examine this record, I submit that the trial court was wrong. In the Lowen case, Helen was going to Walgreens and was entering the store with a shared common entryway with Dominick Foods. She testified that there was quite a nice downpour that day. In fact, it was still raining when she approached the common entranceway. The concrete toward, the outside concrete toward the front door was wet. The exterior mat was wet. The interior mat was wet. And in fact, the flooring around the interior mat was wet. When she stepped off of the mat onto the flooring around the mat, she slipped and she described it as though she had stepped on a piece of paper and the paper slid. She could not identify what caused her to fall and she offered no other witnesses, no experts in terms of why she fell. So how does, in this case, you don't have those facts in this case, Mr. Murphy. We do not. Okay. And so how is, and there's case law that indicates that the owners or the operators aren't liable for failing to remove natural accumulation. So they have no duty to warn of such a condition, which you might have in that case. But in this case, you don't have a natural accumulation. You have none of that. We do not have natural accumulation. So is it the duty, are the duties of the golf clubhouse manager different than the duties of any other business owner? It does not, Your Honor. I believe that the duty by the defendant is simply ordinary care. How they breached that duty, they maintained the floor in a wet condition. Maintained. But that's the question. Was the floor in a wet condition? Yes. The witnesses testified, and let's back up and examine the record. Vera and two other women were playing in this golf tournament. They played four holes. The course was wet. It was dewy. The morning dew. Morning dew. Vera gets into the golf cart with Phyllis. They drive to the clubhouse. They get out, and they park the car on the asphalt cart path. They walk up toward the clubhouse. They walk over the asphalt cart path to the asphalt walkway to the clubhouse. Halfway up, the walkway ends, and it becomes brick paver walkway. There's no testimony that the asphalt cart path was wet, that the asphalt walkway was wet, that the brick paver walkway was wet. There's no mat outside the door. So, obviously, the only thing we can conclude that the wetness was on the bottom of her shoes. Well, that could be an inference that the jury could decide. But now she enters the clubhouse, Phyllis first, then Vera. Phyllis walks down the north-south hallway. No testimony that there's wetness there. Phyllis doesn't have a problem. There's no wetness by the door. Vera turns. No wetness where she turns. She walks all the way along the L-shaped bar. No wetness there. Vera doesn't have any problems. So her golf shoes are not having any problems with traction along those paths. She gets to the end of the L-shaped where the west hallway is, and she falls. Testimony from John Patrick is that there is a trail of water from in front of the water urn that defendant placed on the counter for golfers. But he's the only one that testified to that. Whether it's one or a hundred and one, it's in the record. The trial court had to decide that. That's for the jury to decide. Where did this water come from? It didn't come from the outside. Didn't you just say in the beginning and previously when I asked you that there's no testimony that water was not on the floor? It was being able to maintain the floor for a condition where perhaps somebody has water due under their feet. You said it's the morning dew, and I asked you water. No, the dew. So the golf course had morning dew. But there's no evidence that her shoes were wet from the tract in water because there's no tract in water. The only water is at where she fell, and that's at the terminus of this trail of water from in front of the urn to where she is seen on the ground. So then why are you arguing if there should have been a mat when she came in? The argument is they need to maintain. Where she came in, they don't have to have a mat there. They need a mat where they need to maintain the floor dry. One of the ways to do that is to have a mat in the areas where they know on other occasions there's been spills or simply remove the urn. Don't have water there. And then the floor is dry. So by looking at the record in this case, the trial court I submit made an error by deciding where the water came from. That's a question of fact. So, counsel, even if we assume the water came from the urn or at least the area of the bar, what's the evidence of notice there? Or I think part of your argument has been that the defendant actually or its employees actually created the water problem. So on either end of that, what's the evidence that they either actively created it or that it was there and they had notice or should have had notice of it? Two answers to that, Justice Kennedy. In the videotape, which you haven't seen, the videotape runs for more than ten minutes before she falls. There is no evidence that anybody is walking in that area. There is a view of Mr. Juarez coming from the west entrance, but he isn't carrying anything that would drop water. So you could assume from the videotape that the water is on the floor for more than ten minutes because we have an actual videotape that the jury would see. The other is this is an area where there have been complaints prior to this fall of water being spilled. Chuck Myers from Lake Forest said, oh, I've seen water spilled there. Then he tried to backtrack, saying, oh, it was in the afternoon when the kids were there. Phyllis, who was playing with Vera, said, I've seen water in that area before. But she didn't see it on that day. Not that day. But in fact, I spilled water there on one other occasion and I called Vince and he cleaned it up. So they have noticed that when you put that water on at the end of that counter, there is a more likely than not that there is going to be spill on the floor. And so my argument is, if you have the duty to maintain the clubhouse with ordinary care, one of the breaches would be that you fail to do that by allowing water to be on the floor in an area that you knew or should have known there were spills, or putting it down there so that if people spill it, you don't have a problem. So that's the first question of fact that I believe the trial court made a mistake. Counsel, was it the husband who was the only one who said he saw water? John Patrick, yes. And then there was Vince. When did he say the water was? Was she in the water or was the water five feet or ten feet away? A very good question, Your Honor. It was from in front of the urn in a trail up to where she was on the floor. You could infer that the water that she was sitting on the water because it ran up right to her. And then we have the statement of Vince Juarez who came over. And when John said what happened, he said your wife fell on some water. But he didn't say that in his deposition. Well, of course not. After his deposition, he talked to the insurance company that day, that afternoon. He was told to take pictures the next day because there might be a lawsuit or probably a lawsuit. So by the time I deposed him, of course he denies it. But that morning when John just got there and the paramedics were coming there and John said to Vince what happened, then he said, well, she fell on some water or slipped on some water. He didn't say she slipped on some dew. And there's no evidence in this record there's any track in water from outside, inside the door, or all the way over to where she fell consistent with loading. That's why. Let's talk about Fenton, your expert. Yes. Is it your position that any expert can say a floor is excessively slippery when wet and that automatically creates a question of fact about whether Kemper should have used floor mats? I would answer that by saying an expert with Mr. Fenton's qualifications, similar to the expert in Somese who was a certified architect, whose inspection consisted of visual observation of the floor and touching the floor and made the opinion that water on a terrazzo floor became excessively or unreasonably dangerous. So I believe in this case Mr. Fenton has the qualifications as a certified architect. Knowing the standards that you don't do coefficient of friction testing on the floor because they don't apply if you have golf shoes on. Coefficient of friction testing is applicable if you have regular shoes on. If you have boots, as in the Bailey case, I used one of the experts from that company in that case. And there my client had on snow boots walking around in the slush when she slipped on the paint on the decal. We did testing there. That case is a little different though. It is, but I mean we did testing because she had regular shoes on. Right. Here when you're using specialized shoes, the standard is you don't do coefficient of testing because let's say I get a reduction in the slip resistant value of porcelain tile. Well, the defense is that doesn't apply because you use specialized shoes. That's why you're not supposed to do testing. So I hope that answered your question. Did it? Yes, sir. Thank you. I mentioned the Sommese case talking about Mr. Fenton's expertise. In my amended complaint, I have the allegation to the defendant similar to Sommese, and that is that they supplied a floor that when it was contaminated with water or some other substance, but here it is with water, it provided for a sudden unexpected reduction in the slip resistance value. That's what caused Vera to fall. Say that again. I'm sorry? Say that again, Mr. Murphy. I'll say it more slowly because I think I got garbled myself. No, no. In Sommese, the court said when you have allegations that a floor can become unreasonably dangerous because of wetness, it's not important where the wetness comes from, whether it's tracked in or whether it's not tracked in. The defendant in Sommese had the responsibility of supplying a dry floor. In this particular case, I amended my complaint, and with the allegation that they – I amended my complaint to read, that presented an unexpected sudden change in the slip resistance when golfer's shoes were wet and the golfers were turning directions. Let me ask you, this floor versus the terrazzo floor, this floor, from my looking at the pictures, had some – it wasn't just a slick floor, this floor. Like a terrazzo, which would be just, you know, no grating in it, no – this floor was different, wasn't it? It had grout. It had grout. It had grout, but it didn't have some lines in the – the texture was different. Lines, but it didn't provide any sort of traction value. When water is placed on porcelain tile floor, it is recognized as being unreasonably slippery and unreasonably dangerous. Without any other questions, thank you. I did have one. On Sommese, we're discussing the dangerous condition of the tile. Why isn't that simply the owner or the installer of the tile? Right, that was done in 2016 by the city? Yes, it was like Irving Plaza Shopping Center, I think it was. And I think that's where maybe my deficiencies in order, I couldn't explain properly to the trial court. It does not have to be the owner of the clubhouse, the installer of the floor, who is responsible for the fall of the terrazzo. It can be the maintainer of the clubhouse, the defendant in this particular case. They had the duty to maintain this in ordinary care. I apologize, I lost my train with your question. Yeah, I was just asking how you distinguish the liability of the installer and the owner versus the... So the maintainer can be responsible if the jury decides that its action in Holderman Park contributed to Vera's fall. Obviously, for example, in the Bailey case, I didn't sue the paint contractor. They were not part of my suit. I sued the operator of the gas station. The owner of the property actually was Red Holdings, I think it was. Graham Enterprises operated the gas station. So if the defendant who is the maintainer of the clubhouse is guilty of negligence in the eyes of the jury, they are responsible. Even if there is some other non-party who may have responsibility also. So I could not explain it to the trial court that it just doesn't have to be Lake Forest or Lake Forest who installed it. It can be a combination of negligence, including the maintainer, the defendant in this case, who is responsible for the fall. Any other questions? No. Thank you very much. I have one question. Yes, sir. If I understand your argument correctly, it's that the summary judgment should not have been granted because Mr. Purcell testified there was water on the floor and therefore it became a question of fact for the jury to decide whether Mr. Purcell might be perceived as an interested party because he was one of the plaintiffs for loss of consortium against all the other witnesses who testified that they didn't see any water, was up to the jury and not the judge. Correct. That's in essence your argument, correct? Correct. And your response to Justice Kennedy was if you're installing terrazzo tile and you're arguing that it's not inherently dangerous but only becomes so when there are conditions created that make it so, then an installer wouldn't be necessarily liable unless when he installed it he created a situation where, for instance, there might be a depression so water would pool there, something of the nature where he caused something other than a mere condition, i.e. the condition is there was a floor. And then the next question is what was the approximate cause of the alleged negligent act? And if the installer wasn't guilty of whatever the approximate cause was, then there's no point to sue them because you can't prove liability. Correct. Any other questions? That cleared it all up for me, Justice McClendon. Thank you. Thank you. Mr. Hurley, you may proceed. Thank you, Justice. If you would, would you respond to his affirmative answer to my point which is this is all about one witness who claimed he saw water and therefore this should have gone to the jury to decide who was telling the truth. Sure. I'm happy to respond to that. So I'm not disputing that Mr. Purcell testified that he saw what he saw. And Warren said initially that he saw water. Here's the kicker on that, though. Mrs. Purcell, the person who was injured, didn't see any water on the floor before her fall. She didn't see any water on the floor after her fall. She sat on that floor for 15 minutes until paramedics arrived. She testified that her clothes weren't wet. She didn't see water anywhere. Vera, I'm sorry, Phyllis is the first person to stand over Vera and try to attend to her. There's actually a screenshot of her doing that. Phyllis, who's I think maybe in her 80s, very nice lady, testified that she didn't see any water. And then the third person to come upon Vera was Vince Juarez. He said he didn't see any water and filled out an incident report to that effect. So I guess he falsified an incident report and lied under oath, according to Mr. Murphy. And then Linda, or Miss Hamilton, I want to say Linda. I think she's an actress. But Linda Hamilton, I believe is her name, she was on the golf cart wondering what's going on, walks into the clubhouse, stands over these three folks, also sees no water. So no one's seen any water at this point. Paramedics arrived. They were both deposed. They are employees of the City of Lake Forest, who I represented until they were non-suited. They didn't see any water. And one of the paramedics said if I had seen water and or if Miss Purcell had said that she slipped because of water, I would have moved that because that's important for determining the cause of her fall. Perhaps if she's dizzy or something along those lines, he'd report that. Again, no indication of water. So then John Purcell, who's at home at the time, and he was called to be advised that his wife be involved in this accident, gets in the car, drives over, sees some droplets of water at or near where his wife is positioned on the floor. I ask him at his deposition, where did that water come from? Well, I don't know. What's the source of the water? I have no idea. I mean, it's all in the brief. How long was that water there? I don't know. For counsel to say that, well, it's been there at least 10 minutes, that's not supportive. There was no video before this panel. The video, frankly, doesn't show a close-up of where Ms. Purcell fell. Did the trial court see the video? Yes, it did. It did. And the video is admittedly not the best quality. But because of that video, there's no dispute that she fell where she fell. And so, So there are a lot of back and forth with opinions. Whereas, Purcell said whereas, told him there was water. Then in his death, whereas said no, there was, I never said anything or there wasn't. I never saw any water. Purcell saw the water. Why doesn't this create a question of fact about whether there was water or whether there was not water? So, and on that point, Vera Purcell never told anyone she slipped on water. So how does Vince know that? But even if he did, say, even if he did see water and lied under oath, assume that there was water on the floor, and I've done that. That raises the questions of notice. And counsel's taking the position that, hey, look, I argued, or I've only pled negligence. I'm not pleading premises. I don't have to prove notice. Isn't this a premises case? Oh, no. Oh, no. And you didn't hear one thing from counsel this morning about that. When this case was before Judge Barones, all I heard is, I don't have to do anything other than prove my case under ordinary negligence principles. This is not a premises case. No defenses are available to KSM, to Kemper Sports Management. So in other words, I'm left with nothing to defend. But then on the other side of his mouth, he's saying, well, this is a condition of property, and there's water, and there should have been mats, and there's track and water. This case has been a moving target since the day it was assigned to me. And it's still a moving target as I stand here today. I just heard that now the whole idea of having mats and the need for mats, well, that's no longer an issue. Why are we here then? Because I guess that was half the brief, is why we should have mats to protect against moisture that's tracked in from the outside. Would that be admissible as evidence anyway? Because it's after the fact or after the incident alleged remedies? There was no mats out on the day of. That's what I'm talking about. In her deposition, Kristen Borres said that at the meeting with the city and Kemper manager, which was, I think, a Rick Walroth at the time, that there were discussions about using floor mats in high-traffic areas. So why does this not create a question of fact as to whether or not they breached a duty by failing to use floor mats? Well, there's no obligation to have floor mats to protect against track and water. And so that's why the trial court looked at Loewy, and that's why I cited it. So there were no floor mats on the day of this accident. We know this. No, no. In large part because those floor mats often curl up or become unkempt in such a way that they present tripping hazards. And Vince Juarez, who was the manager at the time of this accident, testified to that effect. Rick Walroth was the general manager prior to Juarez. He was deposed, and he talked about how he operated things. But Vince Juarez had the discretion to use floor mats or not, among other things. And so, again, I just heard, though, that floor mats, well, for one, she didn't fall at the door. Okay? So she didn't fall while walking in or out of the clubhouse. So why are we talking about floor mats? She was about 20 feet away. Are floor mats limited to the front of the door? No. You can put them anywhere you want. Right. The allegations are that there should have been floor mats both outside and just inside the door. When I asked him that, he said no. Right. Now I'm hearing that. Let's talk about Fenton's opinions. We talked to Mr. Murphy about Fenton's opinions. Why don't Fenton's opinions, why isn't his opinion that the floor mat, the floor was excessively slippery when WAC created question of fact? Well, I'm. Whether or not they had a duty to clean it up or to use floor mats. We'll let that pass. Okay. It does this every first Tuesday. Every Tuesday of every month? Yes. Every Tuesday at 10 o'clock. That's why we don't usually set floor mats on Tuesday at 10 o'clock. It's coming around again. Mr. Fenton, so the original theory of liability was tied to the water cooler and the water cooler only. I took Mrs. Purcell's deposition. She talked about her shoes being wet. She talked about how she walked into the, that the course was wet with morning dew. Within a week, I received an amended complaint with an entirely new theory of liability regarding these floors. At that time, the City of Lake Forest was in this case. The City of Lake Forest purchased, actually, before they even purchased the flooring, an architect that wasn't named in the case ever for reasons unknown, recommended this type of flooring for this clubhouse. So this flooring was put in in summer of 16. The City of Lake Forest took that recommendation, purchased it, installed it, and gave Kemper the facility that it managed. And so if we're talking about who's responsible for choice of flooring, there's no dispute that the City of Lake Forest, a non-party to this case and this appeal, provided it, supplied it. So the question has been. . . But they weren't responsible for maintenance. Right, they weren't. . . No, that's why KSM was there. So is this panel asking me to say that Kemper should be responsible for a couple drops of water on the floor and near a water run and a water fountain? Because if that's the case, then no business should supply any form of water sources. And that's why by saying, hey, I didn't see the water before or after, well, that leaves me to say, well, then where did it come from? She didn't know, so she put her head in the sand. The husband comes in and says, well, I saw drops of water, and I asked him, where did they come from? He didn't know. So this, again, implicates notice. And so this case could be decided. . . Are drops of water enough to equate excessively slippery runway? No, they're not. No one. . . Mrs. Purcell has entered and walked upon this clubhouse 60 times prior to her fall. She testified she had no trouble walking. She entered the clubhouse, testified under oath that she had no trouble entering the clubhouse, no trouble traversing that floor. All the people that came to her aid, none of them had any difficulty walking on that floor. It's a few drops of water. That's all we're talking about now at this point. Where did they come from? And if we want to talk about active negligence, were those drops of water put there because of the negligence of KSM? There's no support to that argument. It's not as if someone was mopping the floor and left some drops on the floor or some employee overfilled a water bottle before going back to work. I mean, Mrs. Purcell didn't offer any testimony to that effect, nor did Mr. Purcell. So if we're going to talk about Mr. Fenton, well, he was hired to clean up the deposition testimony provided by Vera Purcell, which was frankly terrible. She literally said she had no idea where anything came from. I asked her, were the bottoms of your shoes wet? No. Okay, well, where did the water come from? I don't know. And so, yes, she was injured, I understand, and I'm sympathetic to that. But she did not help the case, and Mr. Purcell didn't either. He was deposed the same day. Hence, we retain an expert to clean it up and say it's an unreasonably slippery floor. There's no prior accidents attributed to this floor besides this one. Those are the points. So, Counsel, in terms of what I understand the argument to be from the plaintiff, the prior existence of water should, you know, essentially, I guess, put on notice the defendant that this urn had been a problem in the past in terms of water being there. And so I understand what you're saying in terms of the witness testimony. But if we assume, as I think we have to for the purposes of, you know, from at least one person, and maybe as against everyone else, that there was water there. But let's assume there was water there. I am. Why is notice not sufficient in these prior incidents that have been alleged of water being there, you know, during other – I'm not saying on the same day. Yeah, it's definitely not the same day. But prior incidents is what I think they're alleging in terms of notice. So no witness has ever said that – and first of all, Chuck Myers is an employee of the City of Lake Forest who said, you know, he's occasionally seen water on the floor. He hasn't said it was directly under this urn. But the fact that there's water on the floor the day prior or a month prior or a year prior is irrelevant. Well, doesn't that have – I mean, I know that they're talking a different theory here, but doesn't that have something to do with notice and duty? No one has said that there's a leaky urn. And so you still have to show that if you're not going to – if you're going to eliminate notice, then you have to show that that water was placed there by an employee of KSM. There's certainly no argument that I've heard that that water was put there by KSM. So either we remove any option to have water, let's rip out the water fountain, let's not offer a water urn, because apparently if there's water on the floor and counsels you on any day prior to an accident they were on notice, I've seen no case that has held as such. And that would be extremely burdensome if you talk about duty. Let's look at the four duty factors. To prevent a few drops of water that may have been on the floor for minutes prior to a witness seeing it on an unrelated day, I've seen no case that has ever held that. And if the pain were to come down to that extent, then most businesses would be well advised to remove the option to purchase water, to have a water fountain, or to frankly even have washrooms. Because that's what this panel seems to be indicating, that if there's water on the floor on days prior, months prior, weeks prior, that somehow that implicates notice. Respectfully, I don't see how it does. He relies heavily on his SOMES case. Yes. How do you distinguish it? Yeah. SOMES – well, for one, there's coefficient of friction testing. I've heard no standard that says you can't use golf shoes to perform coefficient of friction testing. They just didn't want to see the results. I mean, let's be real. Because she had superior traction in golf shoes. And this floor is kind of like a – almost like a parquet floor or something. That's a porcelain tile floor. That looked kind of like – It's like faux wood. Right, right, right. Kind of like – well, that's real wood. It's behind you. This is a – Yeah, how dare you. How dare you say that. But, no, it's faux wood, and it was put in, again, per the recommendation of an architect in Salt Lake City. Is there a standard shoe? For purposes of testing? Or do they take the shoe that's on the foot of the plaintiff and do a coefficient determination? I'm not sure why they did it. Again, I think it's because they didn't want to see the result. But I'm not familiar with that. I understand that these shoes weren't soft spikes. They weren't hard spikes. They weren't waffling. Or what reminded me, during my youth, of a Congress All-Star or some sort of walking shoe that has undulations on it. Like a Red Ball Jack. Yes, or a CF Flyer. But my point is that, depending on what the type of shoe was, I've unfortunately forgotten my golf shoes and ended up playing in flat sole moccasins. And sometimes I've played better because of it. But be that as it may, I don't know, and I'm asking, does the record reflect what a coefficient of friction test is modeled after? Is it actually using the shoe in question, so to speak? Or is it using a generic shoe? When he said, and I think Mr. Murphy said, an ordinary shoe. Well, what is an ordinary shoe? We didn't hire a rebuttal expert. Because leather is much, my experience in my life has been that leather is much slipperier when wet than non-leather sole shoes are. So they were eco, ECCO, flat bottom, soft nub. So there was no spikes, certainly no metal spikes, and no plastic spikes on these. And there's actually a photo of the bottom of the soles in the record. But going back, her shoes weren't wet. And she said that. You just heard that from counsel. So what are we talking about? Judge Brown said this has been a circular argument presented all along. And Mr. Murphy's been trying to fit a round peg into a square hole. He's still trying to do that here today. I'm hearing a new argument, an argument that's being abandoned. If we're talking about drops of water, again, out of the ten people, let's assume then that the water was on the floor, that still implicates premises liability defenses that counsel says aren't applicable because he's suing for ordinary negligence. And so that was the basis of the appeal, was that Judge Brown gave the wrong analysis to this case.  And typical premises liability notice defenses and open and obvious defenses apply. And so for these reasons, Judge Baronis reviewed the record. He made it clear that he read everything. And he was forced to rule on statements of fact that were in dispute, and he ruled in our favor. He denied a motion to reconsider. I see no reason to upend the hard work performed by Judge Baronis in this case. It is a four-year-old case with a very lengthy record. And for all these reasons, I respectfully request that this panel affirm judgment of the lower court. Thank you very much for your time. Thank you. Thank you. Mr. Murphy, you may make rebuttal. Mr. Murphy, before you go on, tell us why this is not. I'm sorry? Tell us why this is not a premise liability case. The reason I believe it is not a premise liability case is that I pled it in active negligence. And if I support that theory, however slight, I'm entitled to proceed under that theory. The active negligence is that the defendant failed to maintain this floor in a dry condition. That sounds like premises liability. And I say that because with premises liability, it's usually a situation where the premises are not constantly in the control of the defendant, i.e., there are invitees or licensees on premises who he or she or it doesn't have control over. So if you are arguing, as you say you are, and I accept you for the proposition, doesn't that at least infer, if not imply, that there were no licensees, there were no invitees, and that supposedly it was the defendant or their employees or agents were the ones who were the guilty parties of failing to keep it safe based upon their own negligent acts? Because if it is, I guess you could pretty well argue that notice doesn't mean anything in a situation like that where the agents or the principal was the person who committed the negligent act. And you are correct. Notice is not an issue in an active negligence case such as the Smart v. City of Chicago where the court granted the 10-series jury instructions for ordinary negligence and said notice is not an issue. In the Reid v. Walmart case, again, another case where the court said active negligence was pled and was supported by the evidence and notice was not an issue. Wynn v. Hyvee where they put down a mat that was curled. And the defendant said, well, once the mat was put down, it became a condition of the property. And the trial court said, no, that's not true. No, it was affirmed and appealed that it was the active negligence of placing a mat down and therefore notice was not an issue. Isn't that an affirmative act, though? Like what's the affirmative act here? That's a very... You're saying it's the failure to place a mat. And that's a very good question. But you can have an affirmative act by not doing something. You don't have to always, like in the Wynn v. Hyvee, put something down. In the Smart v. City of Chicago, although there was a milling grinding on the street at the time, it was allowing this trough to exist there. That was why the bicyclists fell over. So I believe in this particular case, the failure to maintain the floor in a dry condition was the affirmative act. Mrs. Purcell did not see the water after she fell. Why? I don't know. Maybe the jury would say, man, I'm looking at my wrist and the bones are protruding and it's bleeding all over my clothes. I'm not looking at the floor. Did the trial court see the video? This has been a long case. I submit to you, no, it did not. In the deposition of Patrick Purcell and Mrs. Purcell, the video was used and screenshots were attached as exhibits of the exhibits used in that deposition. They were not, the actual video was not given to the trial court who did not see it. And that's why I'm looking to supplement the record here. What would the trial court have seen had they had the video? What would we see if we had the video? Good point. The only thing you would have seen is two women coming in from the outside, making a turn, one going straight down, and no problem there. And then the other one was you could just see her on the floor. There's a shadow. You don't see the floor, so it was basically worthless. But the argument is you do see ten minutes of the one channel looking west where the water was on the floor. The jury could say that was more than enough notice if you thought, in your collective wisdom, that this is a premise liability case. That's the reason I brought it up. Are the trail of water drops from the urn to where she was on the floor, is that sufficient to cause her to fall? Isn't that a question of fact? And the fact is. You're submitting you saw that water trail on the video. No, you can't see it. That's behind the counter. The only person who saw, and this goes to the weight, not the disability, is John Petty. And finally. I'm sorry. You can close, number one. And number two, before you leave, we may have further questions. Okay. The fact that Vera had walked 60 times in this clubhouse, the fact that she walked that morning into the door, made her turn, walked in front of that bar. We agree. And the reason she didn't have a problem was the floor was dry. As long as this floor is dry, it's got good coefficient of friction. Even in golf shoes. It's when you contaminate it and allow water to be present, that's what causes the approximate cause. It causes her to fall. Okay. Any other questions? I have one, Justice. I only have two comments. You spoke very well considering you had a root canal. Thank you. And in eighth grade, I had a tank that was battery driven and a little wheel that would make it turn and so on and so forth. And I used it on an inclined plane that I varied to establish something called the coefficient of friction, which meant at a certain point, the angle was so steep that the coefficient of friction was such that the tank slid down the incline. So, it's somewhat interesting, at least to me, how fortuitous my experiment back in 1958 has served me so well so far as knowing what a coefficient of friction is in this case. Thank you very much. Thank you. It's adjourned. All rise.